ON MOTION FOR REHEARING AND MOTION FOR REHEARING EN BANC
THOMAS, J.
We deny Appellees’ Motion for Rehearing and Motion for Rehearing En Banc, withdraw our original opinion dated April 24, 2013, and substitute this opinion in its place.
In this workers’ compensation appeal, Claimant challenges an order of the Judge of Compensation Claims (JCC) that denies in part his claims for workers’ compensation benefits. Claimant argues the JCC erred by (1) improperly shifting onto Claimant the burden to prove the compen-sable injury was the major contributing cause (MCC) of his disability and need for surgery; (2) finding that the medical services at issue did not constitute “emergency services and care” and that lack of notice to the Employer/Carrier (E/C) rendered the surgery non-compensable under chapter 440; and (3) finding the opinion testimony from the emergency room physician, Dr. Acebal, is not admissible pursuant to the “self-help” provisions contained in chapter 440.
We affirm without further comment the JCC’s conclusion that opinion testimony from Dr. Acebal is not admissible evidence under the “self-help” provisions contained in chapter 440. But, we nevertheless conclude that under the facts and procedural history of this case, the JCC employed incorrect legal standards in conducting the major contributing cause analysis required by section 440.09(l)(a)-(b), Florida Statutes (2005). We further conclude that the JCC also used an incorrect legal test to determine whether the services and care provided by Dr. Acebal were “emergency services and care,” compensable under chapter 440. Because of these errors, and based on our conclusion that the opinion testimony of those physicians who have provided compensable emergency services and care are admissible as “authorized treating provider[s]” under section 440.13(5)(e), Florida Statutes, we also conclude that the JCC used improper legal standards in determining that Dr. Acebal’s medical opinions were inadmissible in the proceedings below. Based on these errors, we reverse the order on appeal, and remand for additional proceedings and additional factual findings based on the correct legal standards announced herein and the evidence already offered in the proceedings below.

BACKGROUND

On March 20, 2006, Claimant injured his lower back in the course and scope of his employment. The E/C accepted Claimant’s accident as compensable, and authorized treatment of his lumbar spine with Dr. Christopher Brown. Claimant declined surgical treatment offered by Dr. Brown, and in September 2006, Dr. Brown placed Claimant at maximum medical improvement (MMI) with a 6% permanent impairment rating for an L5-S1 disc herniation. This lower back condition was accepted as compensable by the E/C.
From 2006 through 2010, Claimant returned to Dr. Brown on several occasions due to recurrent low back pain; Dr. Brown continued to recommend surgical intervention for the compensable lower back injury, which Claimant declined. In December 2010, Claimant agreed to under *247 go epidural steroid injections, and was referred to Dr. Joel Salamon for pain management and the first injection, which was authorized by the E/C. Dr. Brown saw Claimant twice after his pain management referral, and on those visits Claimant reported significant improvement. Claimant was scheduled for a second injection, but before receiving this second injection he developed significant back and leg pain and had difficulty standing.
On March 19, 2011, Claimant was admitted to and treated in the emergency room at Kendall Regional Medical Center (KRMC) with a sedative and an injectable pain medication before discharge. Claimant’s pain resumed the following day, and he returned to the KRMC emergency room and was admitted under the care of Dr. Pablo Acebal, a neurosurgeon. Dr. Acebal evaluated Claimant and ordered an MRI, which revealed a massive herniated disc at L5-S1 which was severely compressing the nerve roots of the spine. Based on his observation that Claimant was .immobilized and in “unbearable pain,” Dr. Acebal recommended prompt surgery at L5-S1 to treat the condition.
The same day, Dr. Acebal contacted Dr. Brown and, as a professional courtesy, offered to transfer Claimant’s surgery to Dr. Brown. Dr. Acebal advised Dr. Brown that Claimant needed surgery because he had a “huge disc.” According to Dr. Ace-bal, had Dr. Brown given any indication that he would have operated on Claimant “quite quickly” (meaning the next day), he would have transferred Claimant to Dr. Brown’s care. Nevertheless, Dr. Brown advised Dr. Acebal that if Claimant’s condition was emergent and required surgery, “he probably shouldn’t be transferred.” In deposition, Dr. Brown opined that if Claimant could have been transferred, as offered by Dr. Acebal, then the surgery would be “more of an elective type of thing” and “he really doesn’t need to be transferred,” because Claimant could be treated on an outpatient basis. On March 22, 2011, Dr. Acebal performed surgery on Claimant at the L5-S1 level. On March 23, 2011, the E/C denied any future medical care and deauthorized Dr. Brown.
Thereafter, Claimant filed a petition for benefits seeking, inter alia, temporary indemnity benefits (as he remained on modified work duty following the surgery), authorization for continued treatment with Dr. Brown, and compensability of the surgery performed by Dr. Acebal. The E/C contested all of these claims based on the following defenses: • “industrial accident not the MCC of temporary disability; industrial accident no longer the MCC of the current need for treatment as Claimant underwent surgery with an unauthorized physician; such surgery was unauthorized and did not constitute emergency care; carrier not placed on timely notice of alleged emergency care; and surgery not medically necessary or causally related to accident.”
At hearing, Claimant attempted to offer into evidence the opinion testimony of Dr. Acebal. The E/C objected, arguing that Dr. Acebal’s medical opinion was not admissible under section 440.18(5)(e) because he was not an “authorized physician, independent medical examiner, or expert medical advisor.” The JCC sustained the E/C’s objection, concluding that Dr. Acebal’s medical opinion was inadmissible, and admitted the doctor’s deposition for “fact purposes only.”
The E/C presented deposition testimony of Dr. Brown that the workplace accident was not the MCC of Claimant’s surgery, and that he could not determine the MCC of the need for the surgery, because he was unaware of any other potential causes of Claimant’s, need for treatment. Dr. Brown further testified' that, although he *248 did not observe Claimant or his condition at KRMC, he concluded Claimant’s surgery was not performed on an emergency basis. According to Dr. Brown, an “emergent reason for surgery would be cauda equina syndrome where a patient would either lose control of his bowel or bladder and have a large disc compressing the nerves that control those organs, and in the absence of such signs, there is no need for an immediate surgery.” The E/C also presented testimony from Dr. Salamon, Claimant’s pain management physician, that back pain is “never” an emergency.
In the order on review, the JCC found that Dr. Brown diagnosed Claimant with a “work related L5-S1 disk herniation and radiculopathy,” and that the “E/C has agreed, and did stipulate” to the compens-ability of Claimant’s low back condition. The JCC also found that there were no identifiable causes for Claimant’s low back condition other than the compensable workplace injury and a pre-existing spon-dylosis (which Dr. Brown opined contributed 10% to Claimant’s symptoms). The JCC further found that the E/C failed to show a break in the causal chain regarding the compensability of Claimant’s back, injury, and the JCC rejected “any medical opinion in evidence” suggesting that Claimant suffered a subsequent injury or accident. Moreover, the JCC found that there was insufficient record evidence to support the E/C’s contention that the “accident is no longer the major contributing cause of the need for treatment!/]” The JCC awarded ongoing treatment with Dr. Brown. None of the foregoing findings, each favorable to Claimant and resulting in an award of benefits, have been challenged by the E/C by way of cross-appeal.
Notwithstanding the foregoing. factual issues resolved in Claimant’s favor, however, the JCC found that Claimant failed to prove the compensable injury was the MCC of the need for surgery. The JCC further found that Claimant failed to satisfy his burden to persuade the JCC that Dr. Acebal’s “unauthorized” care and services constituted “emergency services and care.” In addition, the JCC found the E/C did not receive timely notice of the alleged emergency care. Consequently, the JCC denied compensability of the surgery performed by Dr. Acebal and the temporary indemnity benefits associated with the surgery.

ANALYSIS

The Compensable Injury

Once compensability of an injury is established, sc carrier can no longer contest that the accident is the MCC of the injury. See Engler v. Am. Friends of Hebrew Univ., 18 So.3d 613, 614 (Fla. 1st DCA 2009) (“Once compensability is established, an E/C can no longer contest that the accident is the MCC of the injuries at issue.”); § 440.13(1)(e), Fla. Stat. (2005) (defining “compensable” as “a determination by a carrier or [JCC] that a condition suffered by an employee results from an injury arising out of and in the course of employment.”); § 440.09(1)(a)-(b), Fla. Stat. (2005) (explaining major contributing cause analysis requires comparison of relative causal relationships between preexisting, subsequent, and compensable injuries); see generally Jackson v. Merit Elec., 37 So.3d 381, 383 (Fla. 1st DCA 2010) (concluding carrier seeking to absolve itself from responsibility for medical treatment necessitated by a compensable injury must “demonstrate a break in the causation chain, such as the occurrence of a new accident or that the requested treatment was due to a condition unrelated to the injury ....”).
Here, because the E/C stipulated that Claimant’s L5-S1 disc herniation was a compensable injury and provided compen- *249 sable treatment for the better part of five years, and further, because the medical records and opinions of Dr. Brown established that the L5-S1 disc herniation was caused in major part by Claimant’s com-pensable accident, the JCC found Claimant met his burden of persuasion to establish a causal relationship between his workplace accident and his L5-S1 disc herniation. The JCC rejected the E/C’s allegation and Dr. Brown’s testimony suggesting Claimant suffered a subsequent accident and injury that contributed to Claimant’s low back condition. The JCC further 'found there were only two causes of Claimant’s lower back injury, the workplace injury and a preexisting spondylosis, which Dr. Brown opined was responsible for 10% of Claimant’s symptoms.
The order on appeal awarded contested benefits to Claimant, and was therefore not wholly favorable to the E/C. Because the E/C neither appealed nor cross-appealed the findings of fact favorable to Claimant, these favorable findings cannot be challenged by the E/C in this appeal. A cross-appeal is an appellee’s exclusive method of obtaining relief from error in an order, and absent a cross-appeal, an appellee may not seek affirmative relief from any part of the order; the appellee may only defend the order. See Premier Indus. v. Mead, 595 So.2d 122, 124 (Fla. 1st DCA 1992) (“Because North-brook failed to invoke the appellate jurisdiction of this court by filing a notice of appeal, notice of cross appeal, or notice of joinder in the appeal by Premier and Sentry, it has remained an appellee and is not authorized to use its status as such to argue positions as an aggrieved party in derogation of the appealed order.”). Based on the foregoing, and in light of the legal errors raised by Claimant in this appeal, we conclude that the JCC misapplied the MCC standard in denying the medical treatment at issue.
Section 440.09(l)(a)-(b) sets forth the textual basis for coverage of injuries under chapter 440. This section provides that “the accidental compensable injury must be the major contributing cause of any resulting injuries” for which treatment or benefits are sought. § 440.09(1), Fla: Stat. (2005). “Major contributing cause” is expressly defined as “the cause which is more than 50 percent responsible for the injury as compared to all other causes combined for which treatment or benefits are sought.” Id. (emphasis added). Although this definition does not contain a list of “other causes” that may be considered in performing the MCC comparison, the two subsections that follow — both of which specifically explain how MCC analysis is to be performed — distinctly limit the “other causes” that may be considered to (1) preexisting injuries and conditions, or (2) subsequent injuries. See § 440.09(l)(a)-(b), Fla. Stat. (2005).
In short, under the text of section 440.09(1)(a)-(b), MCC analysis cannot be performed in a vacuum or, particular^ in the absence of competing causes, as this court has previously concluded. See Lanham v. Dep’t of Envtl. Prot., 868 So.2d 561, 563 (Fla. 1st DCA 2004) (“In that the record discloses there was only one cause of claimant’s injuries, rather than competing causes, claimant was not required to present additional evidence going to the issue of whether the work-related accident was the major contributing cause of the injuries.”); Bysczynski v. United Parcel Servs., Inc., 53 So.3d 328, 331 (Fla. 1st DCA 2010) (“In sum, because all the medical evidence establishes that the only contributing causes of Claimant’s need for the cervical spine fusion were occupational in nature, the JCC erred in applying the major contributing cause standard to deny *250 the surgery. Accordingly, the order on appeal is reversed and this case is remanded for entry of an order authorizing the surgical spine fusion.”); see also Caputo v. ABC Fine Wine & Spirits, 93 So.3d 1097, 1098 (Fla. 1st DCA 2012) (stating if “ ‘there was only one cause of claimant’s injuries, rather than competing causes, claimant was not required to present additional evidence going to the issue of whether the work-related accident was the major contributing cause of the injuries.’ ” (quoting Lanham, 868 So.2d at 563)).
Here, to avoid responsibility for the surgical treatment of the L5-S1 herniation, the E/C attempted to demonstrate a break in the causation chain between the workplace accident and the compensable lower back injury, and sought to prove that the surgery was to treat a new and unrelated injury or medical condition. But, the JCC found Claimant did not have a subsequent accident or lower back injury. Because the E/C did not cross-appeal the JCC’s findings in this regard, including the JCC’s rejection of all medical opinions founded on the occurrence of a subsequent accident or injury, these findings cannot be reviewed by this court. Premier Industries, 595 So.2d at 122.
Thus, the JCC found there were “only” two causes of Claimant’s lower back condition for which the medical treatment at issue here was provided: the L5-S1 herniated disc and a preexisting spondylo-sis. Further, the JCC did not find that the preexisting spondylosis was the MCC of Claimant’s need for medical treatment; on the contrary, the JCC awarded Claimant ongoing medical care because there was insufficient evidence to support the E/C’s assertion that the workplace accident was no longer the MCC of Claimant’s need for medical treatment.
Given these findings, the JCC’s conclusions on the issue of the MCC of the need for surgery are inconsistent. Under the dictates of section 440.09(l)(b), Florida Statutes (2005), and this court’s relevant case law, the JCC should have weighed the relative contributing forces of the two established contributing causes of Claimant’s lower back injury that required medical treatment. Because the JCC failed to engage in such analysis, we reverse and remand for the JCC to perform MCC analysis consistent with this opinion — based on the evidence already introduced, and in light of the unchallenged factual findings favorable to Claimant contained in the appealed order.

Emergency Services and Care

We turn next to Claimant’s second point on appeal, which asserts' the JCC also applied an incorrect legal standard to determine that the medical care provided by Dr. Acebal did not constitute “emergency services and care.” Claimant’s argument on this point also has merit.
Under section 440.13(l)(f), Florida Statutes, “emergency services and care” is defined, by its reference to section 395.002, Florida Statutes (2005), as follows:
(10) “Emergency services and care” means medical screening, examination, and evaluation by a physician, or, to the extent permitted by applicable law, by other appropriate personnel under the supervision of a physician, to determine if an emergency medical condition exists and, if it does, the care, treatment, or surgery by a physician necessary to relieve or eliminate the emergency medical condition ....
§ 395.002(10), Fla. Stat. (2005). Thus, “emergency services and care” begin when a physician undertakes a medical screening, examination, or evaluation to determine whether an emergency medical condition exists. Here, the JCC concluded that, because the surgery performed by *251 Dr. Acebal was not an emergency, Dr. Acebal provided no emergency services and care. But, the JCC did not consider the variety of services that are covered under section 395.002(10), including “medical screening, examination, and evaluation by a physician ... to determine if an emergency medical condition exists.” Id.
 Thus, under the requirements of section 395.002(10), the relevant questions regarding whether emergency services and care were provided by Dr. Acebal are: (1) whether the service provider is a licensed physician (or other appropriate personnel acting under the supervision of a physician); (2) whether an evaluation, screening, or examination was conducted by that physician (or other authorized personnel); and (3) whether such care was undertaken by the physician with the intent of determining “if an emergency medical condition exists.” Under normal circumstances, these simple questions can be answered by the finder of fact without resort to medical opinion testimony.[1]
If each of these questions is answered in the affirmative, then under section 395.002, and thereby under section 440.13(1), “emergency services and care” of some sort have been provided. Here, the foregoing relevant questions went unanswered by the JCC; accordingly, we agree that the JCC employed an incorrect legal standard in determining whether Dr. Acebal provided emergency services and care of some sort to Claimant.
Because the JCC failed to use the correct legal standard to determine whether emergency services and care were rendered to Claimant by Dr. Acebal, and further, because the evidence is such that a reasonable finder of fact could conclude that the evaluations and diagnostics performed by Dr. Acebal qualified as “emergency services and care” as defined under the Workers’ Compensation Law, we reverse and remand for the JCC to determine whether Dr. Acebal provided any services and care that would qualify as “emergency services and care” as defined under the statutory provisions discussed herein.
We note, however, that simply because emergency care was provided does not make such care “compensable” under chapter 440. Neither does this fact alone render the providing physician eligible for payment under chapter 440, nor does the fact that a doctor who provides some com-pensable emergency care, such as examinations and screening, make all care provided by this doctor compensable. Rather, the compensability of emergency care under chapter 440, and the providing physician’s eligibility for payment for such care, is dependent on additional elements contained in the Workers’ Compensation Law.
These two additional elements are the following. First, as with all medical care awardable under chapter 440, the care must be medically necessary. § 440.13(2)(a), Fla. Stat. (2005) (an employer has an obligation to provide “such medically necessary remedial treatment, care, and attendance for such period as the nature of the injury or the process of recovery may require,” including emergen- *252 ey care). Second, under section 440.13(3)(b), emergency care is “compensa-ble” if the “injury requiring emergency care arose as a result of’ the workplace accident. Thus, to be “compensable,” such care must be not only “emergency” care, but also “medically necessary,” and it must be provided for a compensable injury.
Here, Claimant’s herniated disc at the L5-S1 level is the compensable workplace injury based on the JCC’s uncontested findings. On remand, if the JCC determines that Dr. Acebal provided emergency services and care, including screening and testing, the JCC must then determine whether any of the emergency services and care were compensable under the standards announced above — without reliance on Dr. Acebal’s medical opinion testimony.
We now turn to whether the JCC also erred in determining that Dr. Acebal’s medical opinion testimony was inadmissible under section 440.13(5)(e), Florida Statutes (2005). For the reasons that follow, we hold that a proper interpretation of section 440.13(5)(e) permits admission of medical opinion testimony from a physician who is first proven, through other admissible testimony or other permissible means, to have provided emergency care and services compensable under chapter 440.[2]
Section jM0.13(5)(e) — “Authorized Treating Provider”
Section 440.13(5)(e), Florida Statutes (2005), provides, in its entirety:
(e) No medical opinion other than the opinion of a medical advisor appointed by the judge of compensation claims or the department, an independent medical examiner, or an authorized treating provider is admissible in proceedings before the judges of compensation claims.
This plain language limits the witnesses who can provide medical opinion testimony to an expert medical advisor “appointed by the [JCC],” an independent medical examiner, or an “authorized” treating physician.

Emergency Providers

Although all other physicians providing compensable care under chapter 440 must receive express authorization “from the carrier” [3] to be eligible for payment for *253 treatment provided to an injured worker, this rule does not apply to emergency care physicians. See § 440.13(3)(a), Fla. Stat. (2005). By legislative decree, “all licensed physicians and health care providers in this state shall be required to make their services available for emergency treatment of any employee eligible for workers’ compensation benefits,” with or without authorization from a carrier. § 440.13(3)(b), Fla. Stat. (2005). “To refuse to make such treatment available is cause for revocation of a license.” Id.
Under the language of section 440.13(3)(a), routine medical care must be authorized by the carrier, and only through such authorization may a physician become eligible for payment (except where the self-help provisions of section 440.13(2)(c) are at play). Cf. Lakeland Reg’l Med. Ctr. v. Murphy, 695 So.2d 895 (Fla. 1st DCA 1997) (holding claimant cannot “authorize” doctor under chapter 440), with Parodi v. Fla. Contracting Co., Inc., 16 So.3d 958, 962 (Fla. 1st DCA 2009) (rejecting argument that “authorization of a physician can emanate only from the unassailable discretion of an employer or carrier,” and holding JCC may “authorize” physician where E/C has wrongfully denied care). In emergency care, however, all licensed physicians are both permitted and required to provide such care, regardless of whether authorization has been furnished. See § 440.13(3)(a)-(b), Fla. Stat. (2005). Thus, based on a reasonable and harmonious reading of the statutory provisions, we conclude that where the admissible medical and lay testimony establishes that a physician has provided compensable emergency medical services, that physician’s medical opinion testimony is admissible as an “authorized treating provider” under section 440.13(5)(e).
In Miller Electric Co. v. Oursler, we held that a medical provider not authorized by the carrier cannot offer admissible medical opinions, until and unless it is first established that this provider furnished compensable care that was medically necessary. 113 So.3d 1004 (Fla. 1st DCA 2013). The facts in Oursler are distinguishable from this case, however, because there, the claimant failed to sufficiently establish that the medical care at issue was compensable or medically necessary, rendering the unauthorized physician’s testimony inadmissible. In this case, however, depending on the JCC’s findings of fact made on remand, the facts may establish that Claimant received compensable “emergency services and care.” '
Importantly, Oursler did not hold that an emergency provider can never be considered an authorized doctor,, whose opinion might become admissible. To the contrary,
[bjecause some medical care from unauthorized providers can later be determined to be covered by workers’ compensation by operation of law, such as that care given in emergency situations ... , such providers’ medical opinions can become admissible as a matter of law.
Id. at 1008. Based on the foregoing, if on remand the JCC determines, without relying on Dr. Acebal’s medical opinion testimony, that Dr. Acebal provided medically necessary and compensable emergency services and care of any sort to Claimant, the JCC must then find Dr. Acebal a treating provider “authorized” to provide such care under chapter 440. If such a finding is made, then, and only then, shall the JCC admit Dr. Aeebal’s medical opinion testimony into evidence under section 440.13(5)(e), to determine whether the surgery performed by Dr. Acebal qualifies as emergency services and care under chapter 440.

*254
The Surgery

Having established that the JCC employed the incorrect legal standards to determine whether Dr. Acebal’s medical opinion was admissible, we now turn to the issue of whether the JCC also used an incorrect standard in determining that the surgery performed by Dr. Acebal did not qualify as compensable emergency services and care under chapter 440.
As discussed above, under section 395.002(10), Florida Statutes (2005), “emergency services and care” include screening, examinations, and evaluations performed by a physician “to determine if an emergency medical condition exists and, if it does, the care, treatment, or surgery by a physician necessary to relieve or eliminate the emergency medical condition .... ” An “emergency medical condition,” as defined in section 395.002(9)(a), Florida Statutes (2005), means:
(a) A medical condition manifesting itself by acute symptoms of sufficient severity, which may include severe pain, such that the absence of immediate medical attention could reasonably be expected to result in any of the following:
1. Serious jeopardy to patient health, including a pregnant woman or fetus.
2. Serious impairment to bodily functions.
3. Serious dysfunction of any bodily organ or part.
(Emphasis added.) Dr. Acebal observed Claimant in the hospital setting, and he testified that Claimant was immobile, in “unbearable pain,” and could not move or stand. Claimant’s symptoms included a massive herniated disc, associated weakness and numbness, “unbearable” pain, and inability to move — conditions which, according to Dr. Acebal’s testimony, impaired Claimant’s ability to walk, a bodily function. Further, Dr. Acebal testified that if this condition was not ameliorated, it could have caused serious jeopardy to Claimant’s health, such as cauda equina syndrome.
The JCC, however, found Claimant’s surgery was not emergent in nature based on Dr. Brown’s testimony that an emergent reason for surgery would be cau-da equina syndrome, and Dr. Salamon’s testimony that back pain is “never” an emergency. But this is not the correct legal test. Section 395.002(9)(a) does not limit an emergency to certain medical signs, such as cauda equina syndrome, and it does not exclude back pain. Indeed, this statutory provision specifically provides that an “emergency medical condition ... may include severe pain,” where such a condition, in the absence of immediate medical attention, “could reasonably be expected to result” in serious impairment or dysfunction of any bodily function or part. Id. As a matter of law, contrary to the testimony of both Dr. Brown and Dr. Sala-mon, section 395.002(9)(a) (and thus sections 395.002(10) and 440.13(1)(f)) permits pain to serve as the basis of an emergency medical condition, if in “the absence of immediate medical attention” the claimant could reasonably be expected to suffer “serious impairment to bodily functions” or “serious dysfunction of any bodily organ or part.” § 395.002(9)(a), Fla. Stat. (2005).
In this case, there is no dispute that the surgery performed by Dr. Acebal was medically necessary. Thus, because the JCC employed incorrect legal standards to determine whether the surgery qualified as emergency services and care, and thus compensable under chapter 440, and because the JCC used an improper standard to determine whether Dr. Acebal’s medical opinion was admissible in the proceedings below, we reverse the JCC’s denial of the compensability of the surgery and remand for reconsideration based on the proper legal standards announced herein.
Finally, we hold that the JCC erred in ruling that Dr. Acebal’s emergency sur *255 gery was not compensable, because the emergency provider failed to give the E/C timely notice of the emergency treatment, as required under section 440.13(3)(b), Fla. Stat. (2005) (“A health care provider who renders emergency care must notify the carrier by the close of the third business day after it has rendered such care.”). It is undisputed that neither Dr. Acebal nor any other party from KRMC ever notified the Employer or Carrier after Dr. Acebal’s treatment. Section 440.13(3)(b), however, does not speak to the compensability of the care. It does not address whether the medical treatment or care is sufficiently related to a compensable condition, nor does it alter any facts that might establish that such care was provided on an emergency basis.
Further, and dispositive here, section 440.13(3)(b) does not set forth any penalty to the claimant for the emergency health care provider’s failure to give the E/C timely notice of the emergency treatment. To the extent that this statutory notice requirement might affect the compensation that Dr. Acebal is entitled to receive, as opposed to his eligibility for payment based on the compensability of the treatment, the JCC has no jurisdiction over any billing disputes between Dr. Ace-bal and the E/C relative to the provision of compensable care. See J.B.D. Bros. v. Miranda, 25 So.3d 1271 (Fla. 1st DCA 2010) (explaining JCC lacks jurisdiction over billing dispute between carrier and medical provider).
Because the language of section 440.13(3)(b) does not indicate that the Legislature intended that an emergency health care provider’s failure to comply with the notice provisions contained therein renders a claimant responsible for the payment for emergency medical treatment, we decline to adopt such an interpretation here. On remand, should the JCC determine that the surgery provided by Dr. Acebal was medically necessary and was provided on an emergency basis for a compensable injury, the JCC shall not decide any potential reimbursement dispute between the E/C and Dr. Acebal, as the Department of Financial Services has exclusive jurisdiction over such disputes. See § 440.13(11)(c), Fla. Stat. (2012) (stating Department of Financial Services “has exclusive jurisdiction to decide any matters concerning reimbursement”).
Based on the foregoing, we reverse the JCC’s denial of Claimant’s claim for com-pensability of the emergency surgery performed by Dr. Acebal, and the resulting denial of requested temporary indemnity benefits related to this surgery. We remand the case for further proceedings and findings of fact consistent with this opinion, based on the evidence already offered by the parties.
AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.
WOLF, J., concurs; MARSTILLER, J., dissents without opinion.

. Notwithstanding the fact that Dr. Acebal did not obtain authorization from the carrier before providing medical services, there is no dispute that Claimant was permitted to introduce the doctor's factual testimony regarding Claimant's admission to the emergency room, including Claimant's appearance, complaints, diagnosis and treatment. See Office Depot. Inc. v. Sweikata, 737 So.2d 1189, 1191 (Fla. 1st DCA 1999). The issue of whether emergency services and care have been provided can, under appropriate circumstances, be established by non-expert testimony. See Univ. of Fla. Bd. of Trustees v. Stone ex rel. Stone, 92 So.3d 264 (Fla. 1st DCA 2012).

. We are mindful of our opinion in Chudnof-James v. Racetrac Petroleum, Inc,, 827 So.2d 369 (Fla. 1st DCA 2002), where we concluded that the only evidence to support the causal relationship or the medical necessity of the emergency treatment was the opinion of the emergency room physician, which was inadmissible under section 440.13(5)(e); thus, we held the claimant failed to prove by admissible evidence or other permissible means that the emergency care was compensable.
Here, based on admissible lay and expert testimony, and based on the absence of a legal controversy as to the compensability of Claimant's injuries, there is a sufficient basis for a reasonable finder of fact to conclude that Dr. Acebal provided compensable emergency services and care. Thus, Chudnof-James does not control the outcome here. Nevertheless, we reiterate that a doctor not authorized by the carrier cannot offer medical opinion testimony, until it is first proven by independently admissible testimony or other permissible means, such as stipulations or by operation of law, that the physician in question provided compensable medical services.

. We observe that in section 440.13(3)(a), but not in section 440.13(5)(e), the Legislature qualified the term ''authorization” by adding the phrase "from the carrier.” If, however, the term "authorization” signals only that power emanating from a carrier’s express grant of authority, there would be no need for the Legislature to have qualified the term "authorized" in section 440.13(3)(a) by the phrase "from the carrier,” as such language would be surplusage, which would violate canons of statutory construction requiring that verba cum effectu sunt accipienda, "words are to be taken as having an effect.” See generally, Scalia and Gardner, Reading Law: The Interpretation of Legal Texts, p. 174 (1st Ed. 2012).